MERCHANTS' STEAM-SHIP CO. OF CHARLESTON, SOUTH CARO-
LINA, *v.* THE SCHOONER S. C. TRYON.

*(District Court, D. Maryland.* ——, 1880.)

1. COLLISION — SCHOONER AND STEAMER — EVIDENCE CONFLICTING —
SCHOONER HELD IN FAULT.

In Admiralty.

*John H. Thomas,* for libellants.

*Brown & Smith,* for respondents.

MORRIS, D. J.  The case for the steamer, as stated in the
libel, is that she left the port of Baltimore on the afternoon of
the eighth November, 1879, with eight passengers and a full
cargo of merchandise, on one of her regular voyages from Bal-
timore to Charleston, South Carolina; that about 9:45 P. M.,
the night being starlight, with a slight haze on the water, the
wind a seven-knot breeze from the southward, the steamer
going on her course S. by E. one-half E. down the Chesa-
peake bay, at nine miles an hour, having all her regula-
tion lights burning, and her second mate, with an experienced
seaman, in the pilot-house, and two lookouts in the bow,
when, about eight miles above Cove Point, one of the lookouts
reported a *red* light one and one-half points over the steam-
er's *port* bow; that the second mate and the man at the wheel
satisfied themselves that the light was on a sail vessel about
one and one-half miles off, coming up the bay with a fair
wind, and *ported* the helm of the steamer so that she fell off
about one point and a half; that when the said vessels were
within 300 or 400 yards from each other, and were sufficiently
apart not to justify any apprehension of danger, the schooner
being still on the steamer's port-bow, and showing only her *red*
light, the schooner suddenly, and without cause, starboarded
her helm and showed both her lights; that the steamer's
helm was then put *hard* a-port, and her engines stopped, but
said vessels were so near together that the schooner struck
the steamer amidship on her port side, cutting her to the
water's edge, and doing her such damage that she sank in

about 10 minutes in water some six fathoms deep; that the passengers, officers, and crew of the steamer escaped in the small boats, and got aboard of the schooner, and were brought to Baltimore.

The answer of the claimants of the schooner S. C. Tryon alleges that the schooner was coming up the bay on the starboard tack, making six knots an hour, with the wind from southward and eastward, her course being N. by W. one-half W., her master in charge of the deck, a lookout in the bow, and a man at the wheel; that the lookout reported the steamer's mast head light about five miles off, and from a half a point to a point on the schooner's *starboard* bow; that a few minutes after this light was reported the *red* light of a sailing vessel was discovered directly *astern* of the schooner, and 150 yards distant, gaining rapidly on the schooner, so that a collision seemed imminent, unless the schooner fell off and gave the sailing vessel room to pass; that the schooner did fall off for a few seconds, going about 40 feet from the line of her original course, and then resumed her course of N. by W. one-half W.; that the steamer, which afterwards turned out to be the Falcon, continued to bear *one* point on the schooner's *starboard* bow, and was about three miles distant when the schooner resumed her course; that about five minutes later, the steamer's *red and green* lights being then visible, the master of the schooner exhibited to the steamer a *lighted torch*; that the steamer kept her course, continuing to bear one point on the schooner's starboard bow, until she got very near to the schooner, when all at once the steamer ported her helm and started across the course of the schooner; that as soon as the steamer made this attempt a collision became inevitable, and for the purpose of easing the blow, and preventing the steamer from running over the schooner, the helm of the schooner was put "hard down," causing the schooner to go to starboard, and the order had hardly been executed when the vessels came together, the port bow of the schooner striking the steamer's *port* side, at an angle of about 50 degrees, between the stern of the steamer and the stern of the schooner.

It is obvious that the statements contained in the libel and in the answer are in direct conflict and are utterly irreconcilable. The steamer's case is that the schooner was approaching her on the *port* bow, exhibiting her *red* light. The schooner alleges that she was approaching the steamer on the *starboard* bow, exhibiting her *green* light. The steamer claims to have been going to *starboard* to get further away from the schooner's *red* light. The schooner claims that she was already on the *starboard* side of the steamer, and that the steamer, by going to *starboard*, went across her bows and brought about the collision. There was no excuse for any mistake, as the night was starlight, and clear enough to see lights at the distance of five miles, and these two vessels had been approaching nearly head on, and profess to have been observing each other's lights for at least a quarter of an hour.

After examining most patiently the testimony of all the witnesses on board the colliding vessels, I have not found in the statements of those who testify for either side anything *in itself* indicative of an intention not to tell the truth. The navigation of both vessels would seem to have been in the hands of experienced and faithful men, and it has been with great reluctance that I have found that a decision of this controversy must discredit witnesses on one side or the other.

There were on the steamer, during the whole time the vessels were approaching each other, at least one lookout on duty in the bow, and part of the time two. In the pilot-house there was the second mate, who had nothing to do but to watch the navigation of the ship, and a wheelsman, whose sole duty it was to attend to the steering. So that there were at least three men on the steamer attending to duties not at at all difficult for men of their experience to perform, and who could hardly, without the grossest obtuseness, have all escaped seeing the lights of the schooner. That the *red* light of some vessel on the steamer's port bow was reported several minutes before the collision is confirmed, if Captain Kirby's testimony is to be believed. He was sitting in his room adjoining the pilot-house, smoking. He heard the mate answer "Aye, aye, I see it;" heard him give the order "Port a little."

He heard the wheel move, and then the order "Steady;" and some minutes later he heard the mate say, "Confound that fellow, he has altered his course," and give the order "Hard a-port." Hearing that, he says he jumped up and went into the pilot-house, and saw the schooner very near and heading for the steamer at an angle of about 45 degrees on her port bow.

Then, if we look at the schooner, we find that there were on the deck of the *schooner* the *master*, the *lookout*, and the *wheelsman*, all of them (judging from the testimony) experienced mariners, and all of them attending to their respective duties. Their testimony supports, in every particular, the allegations of the answer, and is, so far as I can see, consistent with itself and to all appearance worthy of credit. They asseverate that the steamer was never on their port side, but, from the time she was first seen by them until just prior to the collision, continued steadily about a point on the schooner's starboard bow, showing all the time both her lights. It did, upon first impression, seem to me impossible that to the schooner, which was moving *six* miles an hour, a *steamer*, which was moving *nine* miles an hour, could continue for 15 or 20 minutes to show *both* her lights a point over the schooner's port bow; but, without better information, however, than I now have of such matters, I am not prepared to find that the fact that the steamer was porting her helm and all the time altering her course more or less to starboard, might not have produced that result.

There are, however, some few facts developed by the testimony of persons not on either of the colliding vessels, which, after careful consideration, have brought me to a decision of the questions I am required to pass upon.

The answer alleged, and the master of the schooner and her crew more circumstantially stated, that there was from the first sighting of the steamer another sailing vessel about 150 yards astern, off the schooner's starboard quarter; and one theory of the claimants is that it was the light of this vessel that those on the steamer were observing; that, by reason of their negligent lookout, those on the steamer never

saw either of the lights of the schooner, nor the torch which she exhibited, and that it was not until in the effort to avoid this other sailing vessel, which was to the eastward of the schooner Tryon, and whose *red* light the steamer *did* see, that the steamer brought her head so much over to the westward that she crossed the schooner's bow and then for the first time saw her lights, and supposed that the other vessel had changed her course and that the lights were on her. This theory was not without some support from the facts and probabilities of the case, and tended to reconcile many of the conflicts in the testimony of the opposing witnesses.

After, however, much of the testimony on both sides had been taken, that other sailing vessel was discovered, and she turned out to be an oyster pungy, called the Patterson & Bash. And the testimony of her master and mate was then offered by the libellants. Their testimony is that of persons who actually saw the collision, and who had a fair opportunity of observing much that led to it; persons, too, who have no interest in this controversy, and who are strangers to the parties interested in it. It is testimony, therefore, I think, which in a case of such conflict is entitled to weight, so far as it is intelligently given, and so far tends to prove facts which may have been within the knowledge of the witnesses.

The master of the Patterson & Bash states that he was coming up the bay to Baltimore with a load of oysters, and that, as his was a small boat, he got nearly astern of the schooner Tryon, and kept her all the time about a half a point to the westward on his port bow, as a guide to steer his boat by, and as a protection to him from approaching steamers; that he saw the steamer's lights—*first*, her mast-head light, and afterwards her side lights also, and that the steamer bore as did the schooner, about half a point on his port bow; that at the distance of about a mile the steamer shut in her *green* light and showed only her *red* light, indicating that she had gone to westward; that he maintained his position with regard to the schooner, keeping her about 200 yards distant and about half a point over his port bow, until the schooner got to be some 200 or 300 yards from the steamer,

when both he and the mate testify that they observed the schooner go off to the westward, and he then said to the mate there would be a collision.   He says he was near enough to hear the order given on the schooner, "Hard down! Hard down!" repeated twice, and immediately afterwards he heard the crash of the collision.

Both master and mate testify that for some time prior to the collision they had seen only the *red* light of the steamer, and such was their nearness to the schooner that they undertake to say that the *schooner could not possibly have seen the steamer's green light*.   They testify that for a little while before the collision the schooner bore off to the westward, and that without that change in her course she would have gone two or three hundred yards clear to the eastward of the steamer.   Some of this testimony consists of mere deductions and inferences of the witnesses, and is to be received with great caution; but in part it is a statement of facts which must be accepted as true, and the inferences are mostly such as, I think, necessarily result from the facts.

It must be accepted as a fact that the master and mate of the Patterson & Bash first saw both of the lights of the steamer, and then to them her green light disappeared and they saw only her *red* light, and continued to see only the *red* light up to the time of the collision.   This agrees exactly with the changes in the steamer's course testified to by those on board of her.

Next, it must be admitted that the Patterson & Bash was close to the schooner; the master of the schooner says about 150 yards off, and the master and mate of the Patterson & Bash say never over a quarter of a mile off.   From the testimony of the master and mate of the Patterson & Bash it appears that they kept the schooner nearly in a line between their boat and the steamer, so that I am brought to the conclusion that the lights of the steamer must have appeared to those on the schooner almost identically as they did to those on the Patterson & Bash.   The proximity of the Patterson & Bash to the schooner at the time of the collision is confirmed

by the fact that, with the wind blowing strongly and directly away from them, those on the Patterson & Bash heard the order given by the master on the schooner.

It is to be noticed, too, that the judgment of the master of the Patterson & Bash, as to the effect of the alleged change of course of the schooner in causing the collision, is not a judgment made up after the event, but, unless he swears falsely, was what he at the moment expressed to the mate as soon as he observed the change of course, and before he heard the crash of the collision, and when he could hardly have been mistaken as to the relative positions of the vessels.

The production of the testimony from on board the Patterson & Bash gives rise to another significant consideration. Those on board of her had been sailing near to the schooner for an hour or more, keeping nearly under her stern and using her as a guide to steady their course by, yet they say nothing of the torch-light, which, it is said, was exhibited on the schooner. It is hardly possible that if it was exhibited they should not have 'seen it. A torch is not like a fixed light, which must be looked for to be discovered, but it is a blaze which illumines the deck and sails of the vessel exhibiting it, and makes a glare that it hardly seems possible that any one within a mile or two could fail to take notice of, and which certainly would have been seen by persons on a vessel a little astern and not over a quarter of a mile distant. Evidence was introduced by the claimants for the purpose of showing that the wheelsman of the steamer was not a temperate man, and that he had been drinking when he went on duty at 8 o'clock.

This testimony was not very convincing, and the fact has been strenuously denied, and the charge receives no corroboration from the actions of the wheelsman as the other testimony discloses them. He had been an hour and three-quarters on duty at the time of the collision, under the immediate supervision of the captain and second mate, (the captain having been in the pilot-house until some 10 minutes before the collision,) and, if the wheelsman had failed to understand and execute the orders given him, or to have kept the steamer steady on her course, it would have been quickly detected, and

it is not to be believed that they would have permitted him to remain on duty if such had been his condition.

The whole theory of the respondents' case is, not that the steamer failed to execute through bad steering some maneuver which her officers attempted to make, but that she failed to see the lights of the schooner at all until in the act of crossing her bows. This would have been a fault with which the *wheelsman* would have had nothing to do.

Evidence was also introduced for the purpose of discrediting one of the steamer's lookouts by showing that he was in the forecastle at the time he stated he was on duty and observed the change in the schooner's course; but this is the one of the lookouts who, it was admitted, was liable to be called off for other duties, and was not the one on whom rested the responsibility of uninterrupted attention, and, in the consideration of the case, I have excluded his evidence. Even if it be true that he attempted to swear to facts which he did not observe, I do not think it has been shown that the other witnesses for the steamer were aware of it. It was argued that the steamer's lookout was insufficient because they never saw or reported the lights of the Patterson & Bash. This, I think, is fully accounted for by the fact that the Patterson & Bash being in a line with the schooner and astern of her, her lights would have been hid by the schooner's sails, which were all boomed out. All the steamer's witnesses speak of a vessel which passed to the eastward just after the collision, when they were in the small boats, and which they tried to hail, and it seems probable this was the Patterson & Bash.

Although this case is one of great conflict of testimony, and in which I have had unusual difficulty, the conclusion to which I have finally arrived is that the preponderance of evidence and probability is in favor of the libellants, and that the decree must be in their favor.